556 So.2d 959 (1990)
JOHN DEERE COMPANY, Plaintiff-Appellee,
v.
George EAMES, Defendant-Appellant.
No. 88-1023.
Court of Appeals of Louisiana, Third Circuit.
February 7, 1990.
*961 Percy, Smith, Foote & Honeycutt, J. Michael Percy, Alexandria, for plaintiff-appellee.
Sturgeon & Boyd, John Sturgeon, Ferriday, for defendant-appellant; George Eames in pro. per.
Before GUIDRY, STOKER and YELVERTON, JJ.
GUIDRY, Judge.
Defendant-plaintiff-in-reconvention, George Eames, appeals a judgment of the trial court denying his claims for damages he allegedly sustained when certain pieces of farm equipment were wrongfully seized by plaintiff-defendant-in-reconvention, John Deere Company (hereafter Deere), under executory process. Deere answered Eames appeal seeking an increase in both attorney's fees and experts' fees.
Between July 1980 and April 1985, George Eames purchased numerous pieces of farm equipment from John Deere Company. These purchases were represented by ten separate credit sales, each secured by a note and chattel mortgage.
During the period the contracts were in force, Eames became delinquent on several occasions and applied to Deere for deferrals on the due or past due payments. In accordance with company policy, a number of deferrals were granted to Eames.
Eames did not make payment of the current or the deferred installments which became due on his many notes in December of 1986. Six of the contracts were actually past their final maturity dates, having previously been extended until December of 1986. On these six contracts, payments of $90,996.42 were due. On the four other contracts, which had not reached their extended maturity dates, installments were due totaling $63,786.25. Accordingly, in December of 1986, Eames owed Deere installments totaling $154,782.67 on the ten contracts. Because of his default, Eames was contacted on the telephone by Deere. He requested that a field representative be sent to discuss the contracts with him personally. In accordance with his request, a field representative met with Eames on or about March 19, 1987. At that time, Eames offered Deere the sum of $10,000.00 in cash in March and another $40,000.00 to be paid in the month of April of 1987, claiming he could pay nothing more. Although Deere's representative informed Eames that he was not favorably disposed toward Eames' proposal, he agreed to conditionally take Eames' check for $10,000.00 subject to presentation of his proposal to the representative's superiors. On the following day Eames was informed by Deere that the proposal was unacceptable. At that point, Eames allegedly asked the representative to furnish him with a payoff on each of the contracts. Although Deere routinely furnished Eames "coupons" containing payoff information, on May 6, 1987, Deere's dealer, Ferriday Farm Equipment Co., Inc., furnished Eames a letter itemizing the amount due on each account.
On May 13, 1987, having received no payment on the account, and having received no further offer or correspondence from Eames, Deere filed a petition for executory process. The obligations then owing on each of the ten contracts were cumulated in the petition for a total of $193,761.34. On June 25, 1987, Eames filed a petition for injunctive relief and a reconventional demand for damages against Deere. According to Eames' testimony, his equipment was actually physically seized on July 16, 1987, but was released to him August 26, 1987, after a period of some 41 days. Two days later, August 28, 1987, Deere converted its suit in executory process to one in ordinary process with sequestration. There is no evidence in the record indicating that the equipment was reseized *962 under the sequestration order. In any event, Eames does not question the validity of the order of sequestration.
Upon motion of the plaintiff and without objection from defendant, a bifurcated trial was held with only the issue of damages raised in the reconventional demand reserved to the jury. At the conclusion of the bench trial, judgment on the principal demand was awarded in favor of Deere for the full principal and accrued interest on the contracts, i.e., the sum of $207,408.54, together with attorney's fees in the sum of $25,000.00. On the defendant's reconventional demand, the court found that the course of dealing and estoppel related claims asserted by Eames were without merit; Deere had breached no duty to provide amicable demand; there was no improper cross collateralization of security by Deere; and, Deere was not guilty of any unfair trade practices. The court did find that Deere was unable to prove that the subscribing witnesses to its notes and chattel mortgages were present at the time of their execution, and for this reason, the contracts were not in the form necessary to support executory process.[1] In accord with this finding, the court empaneled a jury to determine whether Eames sustained any damages during the time his equipment was under seizure pursuant to the order of executory process.
Prior to commencement of the jury trial, Eames agreed that certain items of damage which he sought could not be proven and should be dismissed. Specifically, he agreed that the items of equipment rental, loss of forbearance from the Federal Land Bank and attorney's fees were not provable and accordingly, these were withdrawn. The jury found that Eames failed to prove his claims for damages and the trial judge rendered judgment in favor of Deere dismissing all of Eames' demands. Subsequently, Eames filed a motion for a new trial, based upon an affidavit from one of Deere's witnesses that the witness had made a mistake in his testimony at trial. The trial judge denied the motion for new trial finding that the witness' testimony was cumulative. This appeal followed. Deere answered Eames' appeal seeking an increase in the experts' fees and attorney's fees awarded by the court.
Although defendant-appellant, Eames, sets forth some forty assignments of error, the issues presented on appeal have been condensed and are those addressed hereafter under specific headings.
I. WAS DEERE'S SUIT PREMATURE EITHER FOR (A) FAILURE TO MAKE FORMAL DEMAND LISTING A TOTAL PAYOFF FIGURE; OR, (B) BECAUSE OF AN ESTABLISHED PRACTICE OF FOREBEARANCE? WAS DEERE SHOWN TO BE GUILTY OF UNFAIR TRADE PRACTICES?
Installments on Eames' notes were due in December 1986. When he failed to make the scheduled payments, Eames was contacted by telephone by John Deere personnel. During that contact, Eames requested that a Deere field representative contact him in person to discuss his debt. Eames had engaged in this same course of action several times previously and had been successful on those occasions in having his payments deferred.
Deere's field representative contacted Eames on March 19, 1987, and received an offer from appellant to pay $10,000.00 immediately and an additional $40,000.00 the following month. Deere's representative, a Mr. Thurman, informed Eames that he was not favorably impressed by the offer, but, at Eames' insistence, agreed to conditionally accept his $10,000.00 check and present the proposal to his superiors. The following day Thurman informed Eames that his supervisors found Eames' proposal unacceptable. Appellant, then allegedly asked that Deere furnish him with a pay out figure on each of his outstanding notes.
Craig Begert, litigation administrator of Deere Credit Services, testified that besides *963 the notices of payments due provided Eames in December 1986, he was also sent two different mailings of past due notices. Additionally, it was undisputed that all of Deere's credit customers were routinely furnished "coupons" containing payoff information. Finally, in response to Eames' request, Ferriday Farm Equipment Company, Inc., the Deere dealer from whom Eames had purchased the equipment, furnished appellant, on May 6, 1987, a letter containing "... the information you requested concerning your notes with John Deere Company".
Appellant had been notified three times by mail that his debts were due; he had met with a Deere field representative at his own request in a futile attempt to work out a compromise on the sums due; and, finally had been provided with an up-to-date account sheet by the local Deere dealer. We find no merit in Eames' contention that this suit was not prefaced by amicable demand.
As to the issue of forebearance, testimony and evidence introduced at trial established that each and every request by a Deere customer for deferral was handled on an individual basis. After a customer made a request for a deferral of any payment, an investigation of the borrower's circumstances was made by Deere and then the customer was notified if a deferral would be granted. If granted, a charge was levied for this service. Eames was notified the day after he made his request for deferral in March of 1987 that Deere had denied the request.
In Sternberg v. Mason, 339 So.2d 373, 377 (La.App. 1st Cir.1976), writ denied, 341 So.2d 901 (La.1977), our brethren of the First Circuit explained the doctrine of forebearance as follows:
"... An obligee is, of course, entitled to have the contract strictly complied with and to receive his payments promptly when due. However, when there has developed a course of conduct, i.e., routine late payments without complaint or objection over an extended period of time sufficient to create a justifiable belief that it is of no moment, it is essential in the interest of fairness that the obligee make known to the obligor his intent to discontinue acceptance of late payments."
The doctrine of forebearance is not applicable in this case. There was no policy or course of conduct of late payment without complaint. On each occasion when Eames was late he was contacted by Deere and was required to follow a set procedure to request deferred payment. Several deferrals were granted however, each was handled on an individual basis. The same routine was followed with regard to the deferral request in December 1986 except that Deere rejected Eames' request for deferral payments. Under these circumstances, we find there was no established practice of forebearance.
Appellant next argues that Deere's failure to make written demand, listing a total payoff figure, after notifying Eames he was not being granted a deferral was a violation of the fair trade practices act. We find this assertion totally without merit. Eames defaulted on his notes in December 1986. He knew he was in default. He was contacted by Deere both by telephone and by letter. He had personally, unsuccessfully, attempted to negotiate a deferral with a Deere representative. Suit was finally filed May 13, 1987, some three weeks after the close of the unsuccessful negotiations and some five months after default. During that period, Eames was provided the payout information he requested but he made no further attempt to avoid litigation.
II. DID DEERE ILLEGALLY CROSS COLLATERALIZE EACH SEPARATE PIECE OF EQUIPMENT FOR THE TOTAL DEBT IN BOTH THE EXECUTORY PROCESS AND ORDINARY PROCESS SUITS?
Louisiana Code of Civil Procedure articles 461 and 462 provide respectively:
"Art. 461. Cumulation of actions defined
Cumulation of actions is the joinder of separate actions in the same judicial demand, whether by a single plaintiff against a single defendant, or by one or *964 more plaintiffs against one or more defendants.
Art. 462. Cumulation by single plaintiff against single defendant
A plaintiff may cumulate against the same defendant two or more actions even though based on different grounds, if:
(1) Each of the actions cumulated is within the jurisdiction of the court and is brought in the proper venue; and
(2) All of the actions cumulated are mutually consistent and employ the same form of procedure."
In the case sub judice, Deere held ten notes secured by chattel mortgages which had installments due on various dates in December 1986. All were past due and, by their own terms, in default. Deere's separate actions met the requirements of Articles 461 and 462. Its petition lists the contracts separately and does nothing more than total the amounts due on the separate notes to obtain a total gross figure of monies Deere claims it was owed by Eames. We find no evidence that Deere attempted to cross collateralize its notes.
III. DID THE TRIAL JUDGE ERR IN TAXING ALL COSTS TO GEORGE EAMES?
At the close of the bench trial, the court indicated that attorney's fees should be divided into three categoriesthose associated with the executory process portion of the suit; those involved in the prosecution of the ordinary process suit, which the trial judge indicated to be "... more than the average collection suit"; and, those involved in the damage portion of the suit. We find that the trial costs should be similarly divided. The trial judge went on to state that Deere was not entitled to attorney's fees associated with the executory process portion of the suit since he found that executory process was not available to Deere. We find this rationale applicable as well to court costs.
The trial court judgment taxes all costs to Eames. We find this to be inequitable and an abuse of discretion. The costs incurred in connection with the executory proceeding should be borne by Deere. For that reason and because we amend the trial court's judgment to award some damages to Eames (infra), we will amend the trial court judgment to cast Eames with two-thirds of the costs and Deere with one-third of the costs, both at the trial level and on appeal.
IV. DID THE JURY ERR IN FAILING TO AWARD DAMAGES?
This was a lengthy trial producing a monumental record. The jury heard expert testimony from farmers, professors, consultants and a certified public accountant, as well as lay testimony, and concluded that Eames suffered no damage as a result of the wrongful seizure of his equipment. Plaintiff claims that because of the wrongful seizure of his farm equipment, he was unable to produce any catfish in 1987 and that his yield of soybeans was adversely affected.
At the outset we observe that Eames' equipment was under unlawful seizure for a period of only forty-one days, July 16, 1987 to August 26, 1987.
In regard to defendant's catfish operation, equipment was necessary only for the purpose of aerating the fish ponds. Although defendant asserted that his catfish crop was damaged because he was unable to aerate his ponds during the aforestated period, the record reflects that the jury could have reasonably concluded otherwise. Eames seeded his catfish ponds with fingerlings in the fall of 1986. The record reflects that over the winter of 1986-1987 most, if not all, of the fish perished. Although Eames was aware of this fact, he did not re-seed his ponds in the spring of 1987. Evidence in the record established that catfish ponds were not normally seeded in the months of July and August. On the basis of this evidence, the jury apparently concluded that Eames suffered no damage in his catfish operation as a result of the unlawful seizure. We can discern no clear or manifest error in this conclusion.
In regard to Eames' soybean crop, the record reflects that the spring of 1987 was an unusually wet spring and because of this, Eames lost at least 600 acres of crop *965 due to wash out. The wet weather also kept machinery out of the field more than usual, limiting the amount of cultivating and spraying which could be done. The evidence reflected that Eames did not use a pre-emergence herbicide and that his fields had moderate to severe weed problems. Eames claimed that he sprayed his soybeans with "STORM", a herbicide, and was getting good results. He opined that had his "high-boy" not been seized, he would have been able to control the weed problem. This opinion was contradicted by Deere's experts. They testified that part of Eames' weed problem was due to his under-seeding[2] which, according to the experts, produced a plant count per foot one-half of that recommended. Additionally, they opined that "STORM" would not control all of the types of weeds identified in Eames' fields and that the applications of "STORM" were subpotent. Further, they attributed the poor yields from Eames' fields to the facts that Eames planted an early maturing variety of beans too late in the season to get a good yield and a good portion of defendant's crop was infected with lepidopterous insects which infestation occurred after August 26, 1987. On the other hand, the experts admitted that had Eames been able to get a tractor equipped with a wick bar to saturate his fields with "ROUNDUP", this could have controlled the Johnson grass and some of the other weeds not affected by "STORM".
In Ford Motor Credit Company v. Breaux, 406 So.2d 313, 316 (La.App. 3rd Cir.1981), a panel of this court stated:
"A seizure and sale under executory process on foreclosure under a chattel mortgage, which is not an authentic act, is illegal, giving rise to damages in tort. Mid-State Homes, Inc. v. Lartigue, 383 So.2d 99 (La.App. 3rd Cir.1980); General Electric Credit Corporation v. Smigura, 371 So.2d 1363 (La.App. 3rd Cir. 1979)."
Further, in Mid-State Homes, Inc. v. Lartigue, 383 So2d 99, 100 (La.App. 3rd Cir. 1980), we stated:
"Under our jurisprudence a party aggrieved by a wrongful seizure is entitled to recover not only the special damages caused him, but also general damages for mortification, humiliation, mental worry caused by the intentional violation of his property rights. Moses v. American Security Bank of Ville Platte, 222 So.2d 899 (La.App. 3 Cir.1969)."
Eames testified that during the period of time he was negotiating with Deere and after those negotiations broke down and suit was filed, he was nervous and had trouble sleeping. A neighbor, Shirley Ann Swillie, testified that she observed Eames to be nervous and upset during social visits to his home around the time of the equipment seizure. Dr. Dennis Laravia, in deposition, stated that he had been treating Eames for the past 13 years for hypertension. He opined that the controversy with Deere had probably affected Eames' condition since Eames' blood pressure problem was related to stress. Dr. Lavaria did say, however, that as he had not treated Eames since November of 1986, he couldn't document any elevation in his patient's blood pressure during the period of the seizure.
In sum, we conclude that the jury clearly erred when they failed to award Eames any damages. We have carefully reviewed the record in an effort to arrive at an appropriate damage award. We are satisfied that Eames' catfish operation suffered no damage as a result of Deere's unlawful seizure. On the other hand, we do find that Eames' soybean crop suffered some minimal damage during the seizure period. We further find that Eames is entitled to general damages for mortification, humiliation and mental anguish. Under the circumstances, we conclude that a total award of $5,000.00 will adequately compensate Eames for those damages and we reverse that portion of the trial court judgment which denied all damages.
V. DID THE TRIAL COURT ERR IN FAILING TO GRANT A NEW TRIAL?
Appellant argues that he should have been granted a new trial based upon *966 the affidavit of Morris Ray Arthur stating that he had made a mistake in his testimony when he stated he did not remember seeing appellant's crop in 1987. While Arthur did testify that he had not specifically examined Eames' crop in 1987, Arthur also testified that from his casual observation, "[i]t looked similar ... the same [as in past years] .. some of it looked a little worse maybe".
La. C.C.P. art. 1972(2), upon which appellant relies, stated:
"A new trial shall be granted, upon contradictory motion of any party, in the following cases:
. . . . .
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial." (Emphasis ours)
We find that minor technical change in one witness' testimony, which covers only eight pages in a thirteen volume record, was not discovery of evidence so important to the cause as to warrant a new trial, but rather was cumulative; would not have had any tendency to change the result; and, was discoverable before trial. See Chauvin v. Chauvin, 297 So.2d 234 (La.App. 3rd Cir. 1974), and Latiolais v. Tauzin, 477 So.2d 1292 (La.App. 3rd Cir.1985).
VI. ATTORNEY'S FEES
Defendant-appellant argues on the one hand that the $25,000.00 awarded Deere in attorney's fees is excessive, while Deere, in its answer to appeal, seeks an increase in that award.
In Central Progressive Bank v. Bradley, 502 So.2d 1017 (La.1987), our state Supreme Court stated:
"La.Civ.Code Art. 2000 attempts to regulate attorney fees by stating that "[i]f the parties, by written contract, have expressly agreed that the obligor shall also be liable for the obligee's attorney fees in a fixed or determinable amount, the obligee is entitled to that amount as well." La. Const. art. 5, § 5(B) provides that the supreme court has exclusive original jurisdiction of disciplinary proceedings against a member of the bar. The supreme court has a duty to assert that authority to regulate the practice of law. We held in Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982), that the prohibition against a lawyer accepting a "clearly excessive fee" found in Disciplinary Rule 2-106 of the Code of Professional Responsibility, cannot be abrogated by a provision in a note fixing the amount of attorney fees as a percentage of the amount to be collected. This prohibition likewise cannot be abrogated by a law fixing the amount of attorney fees as a percentage of the amount to be collected. City of Baton Rouge v. Stauffer Chemical Company, 500 So.2d 397 (La., 1987). See also Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979). Since art. 2000 attempts to regulate attorney fees, it will not be enforced when the attorney fees fixed by the parties are excessive and unreasonable. Notwithstanding art. 2000, the courts may inquire into the reasonableness of such a fee."
Plaintiff's counsel filed documentation into evidence showing total legal fees and expenses, excluding those connected with executory process, of $64,666.89 through December 8, 1987. As we stated earlier, the trial judge divided the cost of legal representation into three phases. In his discussion of these phases, he gave ample consideration to the factors to be considered as guides in determining the reasonableness of legal fees.[3] We find appellant's claim of excessive fees meritless. We cannot find clear error on the part of the trial judge in awarding $25,000.00 in attorney's fees.
VII. DID THE TRIAL COURT AWARD SUFFICIENT EXPERT WITNESS FEES?
The trial court fixed $250.00 as the expert fee for each of the four expert witnesses *967 called by Deere. We find the court clearly erred in its assessment of experts' fees in that it did not take into account the amount of time spent in preparation for trial by the various experts. Accordingly, we amend that portion of the judgment to award the following expert fees:

M. Dale Harrington, CPA $1,500.00
Grady Coburn, Ph.D. 600.00
M.H. Beleau, DVM 600.00
Gerard T. Berggren, Jr., Ph. D. 600.00

For the reasons stated, we render judgment in favor of plaintiff in reconvention, George Eames, and against defendant in reconvention, John Deere Company, in the full sum of Five Thousand and No/100 ($5,000.00) Dollars, together with legal interest on such sum from date of judicial demand until paid. Further, we amend the experts' fees awarded to the amounts set forth above; we amend the allocation of costs, both at trial level and on appeal, to one-third to John Deere Company and two-thirds to George Eames. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND, RENDERED.
NOTES
[1] On appeal, Deere does not assert error in the trial court's conclusion that Deere's use of executory process was improper.
[2] Eames planted 35.9 lbs. of seed per acre rather than the recommended 52.2 lbs. per acre.
[3] See Code of Professional Responsibility, DR 2-106 and Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982).